

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-25-00191-CR

_____

IVAN VILLALOBOS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 24F1072-202

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

# MEMORANDUM OPINION

A Bowie County jury convicted Ivan Villalobos of murder for strangling his cellmate, Trevor Lewis, a first-degree felony. *See* TEX. PENAL CODE ANN. 19.02(c) (Supp.). The jury sentenced Villalobos to life imprisonment.

At trial, Villalobos argued that he acted in self-defense.

In his sole issue on appeal, Villalobos argues that the evidence is legally insufficient to support his conviction because the State failed to disprove self-defense beyond a reasonable doubt. Via a custodial interview of Villalobos, which was introduced into evidence, the jury heard Villalobos's account of what led to Lewis's death. There was, however, other testimony which told a different version of events. Under the applicable standard of appellate review, the jury could credit that testimony, as well as Villalobos's own account. We affirm the trial court's judgment.

## I. Applicable Facts

Lewis was strangled to death. Doctor Erin Barnhart, the chief medical examiner for Galveston County, concluded that Lewis died from asphyxia due to strangulation. That medical conclusion was consistent with what was seen by William Buttram, an investigator for the Office of the Inspector General (OIG) at the Barry B. Telford Unit. On June 10, 2023, Buttram was called to investigate the death of Trevor Lewis. As part of that investigation, Buttram photographed Lewis's body and observed "deep gouges" on Lewis's neck consistent with strangulation.

2

Villalobos strangled Lewis.  On June 10, 2023, Owanaba Dei, one of three Texas Department of Criminal Justice (TDCJ) correctional officers, responded to an inmate's report of an incident in the cell Villalobos shared with Lewis, cell 38 on pod J.  Dei observed a blue and unmoving Lewis on the floor, with Villalobos behind him, actively pulling what appeared to be a power cord of an electric fan wrapped around Lewis's neck.

As part of Buttram's investigation, Villalobos provided his explanation of events.  Following his assessment of Lewis's body and of the cell Lewis had shared with Villalobos, Buttram, joined by OIG Investigator Michael Sutton, conducted a custodial interview of Villalobos.  The interview was voluntary; Buttram and Sutton advised Villalobos of his rights, including his right to remain silent, but Villalobos chose to speak to them.  At trial, the custodial interview video recording was played for the jury, with periodic stops for testimony by Buttram to provide context for statements made by Villalobos.

Once questioning began, Villalobos asserted that Lewis had plotted to arrange a "death fight" or "death match" between the cellmates as a culmination of disputes between them.  In the days before Lewis's death, Villalobos had complained of Lewis's smoking, dirtiness, and refusal to clean Lewis's half of their cell.  Prior to June 10, 2023, Villalobos and Lewis had fought.  Villalobos had returned from a shower to find Lewis starting to smoke.  Villalobos hit Lewis on the side of Lewis's face with the side of his closed fist (Villalobos described this as a "hammer" blow which was "a little bit over a slap.").  Lewis responded by giving Villalobos a black eye.  Villalobos acknowledged that Lewis was defending himself when he did so.  As part of that fight, Villalobos put Lewis in a chokehold.  With Lewis thus restrained, Villalobos told Lewis

3

that Lewis's smoking was "choking" him. Villalobos said that he would let Lewis go if Lewis promised to stop (or "chill out on") smoking. Lewis made no such pledge but instead extricated himself by threatening to bite Villalobos.

According to Villalobos, the fight that ended with Lewis's death was preceded by Lewis telling Villalobos that other inmates were reporting to Lewis that Villalobos intended to rape Lewis. Further, according to Villalobos, Lewis said that he (Lewis) had made arrangements with inmates from neighboring cells to obtain knives for the two of them so that Villalobos and Lewis could fight "to the death." The final fight began, according to Villalobos, with Lewis breaking the housing of an electric fan so that the motor inside could be used as a weapon. During the struggle, Lewis bit Villalobos. Villalobos was able to get behind Lewis and place Lewis in a "sleeper" hold. Villalobos stated that after he "slept" Lewis, he wrapped the cord of the electric fan around Lewis's neck, dragged Lewis across the cell, wrapped one end of the cord around a stool,[1] braced himself with his foot, and pulled the cord tight. Lewis did not struggle at this point as he had already passed out. Villalobos said that "[he] was going to make sure [Lewis] was dead."

Villalobos said that he believed he had to kill Lewis lest, upon regaining consciousness, or at some later time, Lewis would kill him.

Buttram estimated that Lewis was dead for fifteen minutes while Villalobos continued pulling on the cord while Lewis was unconscious. Inmates from neighboring cells, Adrian Mata

---

[1]Buttram provided the context that the stool was not movable but instead was secured to the cell's concrete floor. Buttram provided the further context that "slept" means or is commonly understood slang for placing someone in a chokehold until they pass out.

4

and Roy Lynn, testified that Lewis never asked them for a knife.

Joshua Williams, a former cellmate of Villalobos, testified that Villalobos once punched him in the eye and tried to put him in a chokehold after becoming irritated that Williams smoked in their cell.

## II.    The Evidence is Legally Sufficient to Support the Jury's Rejection of Self-Defense

In his sole issue, Villalobos argues that the evidence is legally insufficient because the State failed to disprove his claim of self-defense beyond a reasonable doubt.

### A.    Standard of Review

The Texas Court of Criminal Appeals has set forth the standard of review for sufficiency of the evidence when self-defense is at issue. *Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018). Our Court has had previous occasion to implement *Braughton*. *See Williamson v. State*, 589 S.W.3d 292, 298 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Braughton*, 569 S.W.3d at 609).

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Id.* at 297 (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences

from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).

"In drawing reasonable inferences, the jury 'may use common sense and apply common knowledge, observation, and experience gained in the ordinary affairs of life.'" *Id.* (quoting *Duren v. State*, 87 S.W.3d 719, 724 (Tex. App.—Texarkana 2002, pet. struck) (citing *Manrique v. State*, 994 S.W.2d 640, 649 (Tex. Crim. App. 1999) (Meyers, J., concurring))). "The jury is also the sole judge of the credibility of the witnesses and the weight to be given their testimony and may 'believe all of [the] witnesses' testimony, portions of it, or none of it.'" *Id.* (alteration in original) (quoting *Thomas v. State*, 444 S.W.3d 4, 10 (Tex. Crim. App. 2014)). "We give 'almost complete deference to a jury's decision when that decision is based upon an evaluation of credibility.'" *Id.* (quoting *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

"It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* at 298 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of

proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id.* (quoting *Malik*, 953 S.W.2d at 240).

"In evaluating a claim of insufficient evidence in the context of a self-defense issue, we apply the general sufficiency review principles set forth above, in conjunction with sufficiency review principles specific to self-defense." *Id.* (citing *Braughton*, 569 S.W.3d at 609). "When there is a claim of self-defense . . . to justify use of force or deadly force against another, 'the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues.'" *Id.* (quoting *Braughton*, 569 S.W.3d at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003))). "The defendant is required to produce 'some evidence that would support a rational finding in his favor on the defensive issue.'" *Id.* (quoting *Braughton*, 569 S.W.3d at 608). "The State is not required to produce evidence; rather, its burden of persuasion only requires 'that the State prove its case beyond a reasonable doubt.'" *Id.* (quoting *Braughton*, 569 S.W.3d at 608). As a result,

> [i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Id.* (alterations in original) (quoting *Braughton*, 569 S.W.3d at 609). "Further, as with the general sufficiency principles, the trier of fact is the sole judge of the credibility of defensive evidence, and it is free to accept it or reject it." *Id.* (citing *Braughton*, 569 S.W.3d at 609). "Self-defense is a fact issue that is determined by the jury, and '[a] jury verdict of guilty is an

implicit finding rejecting the defendant's self-defense theory.'" *Id.* (alteration in original) (quoting *Braughton*, 569 S.W.3d at 609).

### B. Applicable Law

"'Imminent' means something that is immediate, something that is going to happen now." *Kelso v. State*, 562 S.W.3d 120, 132 (Tex. App.—Texarkana 2018, pet. ref'd) (quoting *Murkledove v. State*, 437 S.W.3d 17, 25 (Tex. App.—Fort Worth 2014, pet. ref'd)). "Harm is imminent when there is an emergency situation and it is 'immediately necessary' to avoid that harm, in other words, when a 'split-second decision' is required without time to consider the law." *Id.* (quoting *Murkledove*, 427 S.W.3d at 25). "Imminence 'has two components: (1) the person making the threat must intend and be prepared to carry out the threat immediately, and (2) the threat must be predicated on the threatened person's failure to commit the charged offense immediately.'" *Id.* (quoting *Cormier v. State*, 540 S.W.3d 185, 190 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd)). "Imminent harm must be shown by affirmative evidence." *Id.* "A threat of harm at some indefinite time in the future is insufficient to satisfy the requirement of imminence." *Id.*

"Section 9.31 [of the Texas Penal Code] provides that, subject to certain exceptions, a person is justified in using force against another 'when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force.'" *Braughton*, 569 S.W.3d at 606 (quoting TEX. PENAL CODE ANN. § 9.31(a)). "The use of force is not justified in response to verbal provocation alone, or if

8

the actor provoked the other's use or attempted use of unlawful force." *Id.* (citing TEX. PENAL CODE ANN. § 9.31(b)). And with respect to deadly force,

> [a] person is justified in using deadly force against another (1) if he would be justified in using force against the other under section 9.31, and (2) "when and to the degree the actor reasonably believes the deadly force is immediately necessary: (A) to protect the actor against the other's use or attempted use of unlawful deadly force."

*Id*. at 606–07 (quoting TEX. PENAL CODE ANN. § 9.32(a)). "A 'reasonable belief' in this context is defined as 'one that would be held by an ordinary and prudent man in the same circumstances as the actor.'" *Id.* at 606 (quoting TEX. PENAL CODE ANN. § 1.07(a)(42)).

### C.   Analysis

Villalobos's own statements supported the rejection of his self-defense claim. The jury was free to determine that, after Villalobos choked or "slept" Lewis, Lewis no longer posed any deadly threat to Villalobos, who continued to choke Lewis. "Self-defense implies defensive and not offensive acts. When the acts of an accused cease to be defensive and take on the offensive, then he becomes the aggressor and is no longer acting in self-defense." *Witty v. State*, 203 S.W.2d 212, 218 (Tex. Crim. App. 1947); *see also Lozano v. State*, 636 S.W.3d 25, 34 (Tex. Crim. App. 2021) (noting that the defendant "might have shot [the victim] once in self-defense, then continued shooting even though he knew [the victim] was no longer a threat").

The jury also could have discredited Villalobos's testimony that "if [Lewis] got up he was gonna try and finish [him] off." Nothing in the record suggests that an unconscious Lewis would get up and be able to attempt to use deadly force on Villalobos. *See Henley v. State*, 493 S.W.3d 77, 92 (Tex. Crim. App. 2016) (plurality op.) ("An imagined future scenario is not

9

enough."); *Graves v. State*, 452 S.W.3d 907, 911 (Tex. App.—Texarkana 2014, pet. ref'd) (stating no evidence of self-defense where the initial aggressor was shot only after he "was in the process of backing away"); *Mitchell v. State*, 590 S.W.3d 597, 605 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (stating that "[a]ppellant was not entitled to use deadly force against an unarmed and injured man" after appellant and victim argued and wrestled where even though victim slammed appellant to the ground repeatedly and then victim let appellant go, appellant picked up a gun and shot the unarmed victim, appellant fled and then returned to fire the final shot). On the contrary, Villalobos did not indicate that Lewis posed a deadly threat to him after he choked him during the first fight.

Villalobos complained about Lewis's smoking and dirtiness. Villalobos had previously responded violently when cellmates smoked in a shared cell, including using chokeholds. The jury could have believed that Villalobos acted in retaliation or anger for Lewis's inability to adhere to Villalobos's demands. *See Stefanoff v. State*, 78 S.W.3d 496, 501 (Tex. App.—Austin 2002, pet. ref'd) ("an immediate, non-deliberative action made without hesitation or thought of the legal consequence"); *Sanchez v. State*, 418 S.W.3d 302, 310 (Tex. App.—Fort Worth 2013, pet. ref'd) (stating defendant "acted out of anger, not protective instinct"). Villalobos also stated, in his video-recorded interview, that there were other options of how to handle the situation with Lewis. He stated that "[he] could have asked the guard and told him. But, [he] was just going to be put in another . . . cell . . . and it was gonna be the same."

Viewing all the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Villalobos committed murder and that his use of

10

deadly force was not justified by self-defense.

We overrule Villalobos's sole issue.

## III.    Conclusion

We affirm the trial court's judgment.


Jeff Rambin
Justice

Date Submitted:     July 1, 2026
Date Decided:       July 23, 2026

Do Not Publish

11